# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 4, 2012

Lyle W. Cayce
Clerk

No. 10-41138

MICHAEL CANTRELL, Individually and as Administrator of the Estate of Matthew Cantrell; AVE MARIE CANTRELL; CREIGHTON CANTRELL,

Plaintiffs - Appellees

v.

CITY OF MURPHY; OFFICER KEVIN MCGEE; OFFICER CLAYTON DACEY,

Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, DAVIS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

After the accidental death of her son, Matthew, Ave Marie Cantrell, along with her husband, Michael, and son, Creighton, filed suit against the City of Murphy and several of its officers. In their complaint, the Cantrells alleged violations of the federal constitution and liability under state common law arising out of the officers' behavior on the day of Matthew's accident. While the district court subsequently dismissed parts of the Cantrells' complaint, it denied certain officers qualified immunity on two claims. This is an interlocutory appeal from the denial of qualified immunity. For the reasons stated below, we reverse the district court's judgment.

No. 10-41138

## I.

## A.

During the early evening of October 2, 2007, Ave Marie Cantrell was in the master bedroom of her Murphy, Texas home with her two young sons, Creighton and Matthew. While she and Creighton watched a movie on her bed, twenty-one-month-old Matthew entertained himself by playing with a newly purchased toy. Although she did not intend to fall asleep, Ave dozed off during the movie. At the movie's conclusion, Creighton, who was four years old at the time, woke Ave up and asked her a question regarding Matthew's whereabouts. Ave then got off her bed, walked towards a nearby doorway, and, upon looking in the direction of an open door leading to her backyard, saw Matthew entangled in an outdoor soccer net. She then raced out to the backyard where she saw Matthew lying on the ground twitching with his neck and arm caught in the net. Upon making this discovery, Ave asked Creighton to retrieve a pair of scissors from the kitchen. When Creighton returned with the scissors, Ave used them to cut Matthew from the soccer net. She then carried Matthew back into the house and laid him on a sofa.

Before arriving to the sofa, Ave dialed 911. Ave's call was received by Stephen Williamson, a Communications Officer with the Murphy Police Department, at 7:26 p.m. After receiving Ave's address and attempting to obtain other information, Williamson dispatched police officers and paramedics to her home at 7:27 p.m. During her conversation with Williamson, Ave stated that Matthew's eyes were dilated and glazed, his skin was pale, and that he was not breathing. She also told him that Matthew was strangled by a soccer net. Williamson unsuccessfully tried to get Ave to calm down so that he could transfer her call to East Texas Medical Center, which at the time provided the City of Murphy with pre-arrival instructions for emergency calls.

No. 10-41138

After approximately two minutes on the phone with Ave, Williamson transferred her call to East Texas Medical Center employee Michael Sexton. Like Williamson, Sexton unsuccessfully attempted to calm Ave down. During their conversation, Sexton asked Ave how long Matthew "was down for"; she told him "probably for about ten, fifteen minutes." Once the Murphy Police Department arrived at the Cantrell home, Ave was disconnected from the 911 line.

Murphy police officers Clayton Dacey and Kevin McGee arrived at the Cantrell home just before 7:30 p.m. Upon arriving at the scene, they entered the house through the front door and could hear Ave screaming in the living room. The two officers then proceeded to the living room where they saw Ave crouched down near the sofa upon which she had previously placed Matthew. Dacey and McGee then pulled Ave away from Matthew in order to check for vital signs and had her wait in an adjacent bedroom.[1]

Once near Matthew, Dacey saw the strangulation marks around Matthew's throat and chest; he also observed that Matthew was not breathing and did not have a pulse. According to McGee, Matthew "appeared to be deceased at the scene." After concluding that "foul play" may have been the source of Matthew's injuries, McGee designated the home a crime scene.

Upon making this designation, McGee, along with Dacey, initiated an investigation. During their investigation, Ave exited the bedroom and began screaming at them. McGee then instructed Dacey to take Ave back into the master bedroom and to stay with her. He also asked Dacey to make sure that Ave did not enter the living room and touch anything. Dacey and McGee also placed Creighton in the bedroom. While in the bedroom, Ave continued screaming and started making suicidal statements. During their time in the

---

[1] The parties dispute whether Ave was actually providing CPR when she was pulled away from Matthew. This factual dispute is immaterial to our resolution of this appeal.

3

No. 10-41138

bedroom, Dacey allowed Ave to call her husband, Michael Cantrell, who was on his way home from work.

According to computer records, paramedics arrived on the scene at 7:32 p.m.; firefighters arrived approximately two minutes later. When the ambulance arrived at the scene, Dacey and McGee emerged from the Cantrell home; while doing so, one of them was making a hand gesture indicating that the patient was deceased. The two paramedics, Brentan Ulch and Randy Armstrong, then exited the ambulance and moved towards the front door. As they were walking towards the front door, the police officers advised them that the house was a crime scene and that Matthew appeared to be deceased.[2]

As the paramedics entered the house, Ulch asked one of the police officers to hold the arriving fire engine to "preserve the scene if it was a crime scene." When the paramedics encountered Matthew on the couch, he did not have any signs of life, nor did he have a pulse or any spontaneous respiration. While his extremities were cold, his head and torso were very warm. After making these observations and deciding that there were no signs incompatible with life, Armstrong and Ulch concluded that Matthew was still a viable patient. They then picked him up, carried him to the ambulance, and began life-saving procedures. Once Matthew was stabilized, Armstrong and Ulch transported Matthew to a hospital in Dallas. While transporting Matthew to the hospital, the paramedics continued providing life-saving procedures. Despite these efforts, Matthew remained pulseless when he arrived at the emergency room.

Lieutenant Adana Barber arrived on the scene at 7:39 p.m. When she arrived, the ambulance was still outside of the Cantrell home. After having a

---

[2] According to Ulch, at no point were the paramedics delayed by the police officers. From the time the ambulance pulled up to the Cantrell home, Ulch estimates that it took them approximately eight to ten seconds to get their bags and walk through the front door. The Cantrells, on the other hand, allege that the paramedics were delayed by the police officers. This factual dispute is also immaterial to our disposition of this appeal.

4

No. 10-41138

conversation with McGee, Barber walked into the home and met Dacey inside the master bedroom. While in the bedroom, both Barber and Dacey attempted to comfort Ave. For example, they asked her to call "people that could come for [her]" and allowed her to speak with her parents over the phone. During Barber's time in the Cantrell home, Ave continued making suicidal statements.[3] After hearing these statements, Barber stated: "She apparently wants to kill herself, so–yeah, why don't we transport her down to the station." Barber ordered McGee to follow the ambulance before it left the Cantrell home.

When Michael arrived on the scene, Barber took Creighton outside to him. Barber then told Michael that they "would be taking [Ave] out of the residence and to the station to try and interview her and because of all the suicidal statements she was making." According to Barber, Michael agreed to this course of action.

Because it was considered a crime scene, Michael was not allowed to enter his home immediately, but he was subsequently allowed to go in to be with his wife. When Michael entered his home, Ave was still making suicidal statements. Dacey and Michael tried to take Ave out of the house through the front door but, when they noticed neighbors and media out front, they decided to go back into the house.

Once back inside the house, Michael stated that he could take Ave to the police station. Michael then walked his wife into their garage and placed her in the front passenger seat of their minivan. After doing so, however, Michael told his wife that he could not take her to the police station; instead, he decided to go the hospital to check on Matthew's condition. Before leaving for the hospital, Michael helped Ave enter the front passenger seat of the police cruiser that was

---

[3]  For example, Ave asked for Barber's gun "so that she could kill herself."

going to take her to the police station.  At approximately 8:47 p.m., Dacey transported Ave to the Murphy police station.

Dacey arrived at the police station with Ave and two of her friends. Detective James Hermes then escorted Ave and her friends to an interview room.  Once inside the room, Ave continued making suicidal statements while Hermes and her two friends tried to comfort her.  After asking Ave if she had "a family minister or somebody that could come [to the station] and help comfort [her] and [her] friends," Hermes asked Ave if she felt like writing down everything that happened.  Ave stated that she did not.

Hermes then asked Ave to tell him what happened at her home.  She agreed, and, while sobbing uncontrollably, recounted what took place earlier in the day.  After attempting to console Ave, Hermes told the group he was going to leave the room.  Before leaving the room, Hermes told them he had called a chaplain to comfort Ave.

Once the chaplain, Dan Rainey, arrived, Ave told him what happened to Matthew.  As she described what had taken place earlier in the day, Rainey attempted to console Ave who, at that point, continued making statements reflecting a lack of desire to live.  Rainey then asked Ave to pray with him; she agreed, and the two prayed together.

Ave subsequently told Barber that she was ready to make a statement. Hermes then reentered the room with the necessary paperwork, and Ave proceeded to write out a statement.[4]

Because of the repeated suicidal statements made by Ave, Barber had decided that emergency mental commitment was appropriate.  At around 11:35

---

[4]  Ave's statement reads as follows: "I am a horrible mother.  I should not be on this earth.  My children deserve better.  I hate myself forever.  I cannot bear this suffering anymore.  My precious baby.  My neglect as a mother had brought this evil inside me.  Jesus have mercy on me.  I love my boys."

No. 10-41138

p.m., Hermes drove Ave, along with two of her friends, to a hospital in McKinney. In his application for emergency detention, Hermes noted that he was seeking emergency detention because he had reason to believe that Ave posed "a substantial risk of serious harm." The following day, Hermes was told by Michael that Ave would be released that same day.

Tragically, Matthew died a couple of days later. A report dated October 7, 2007 states that the cause of death was accidental hanging.

**B.**

In May 2009, Ave, Creighton, and Michael, in his individual capacity and as administrator of Matthew's estate, filed suit in federal court against Murphy (the "City"), East Texas Medical Center, McGee, Dacey, Barber, Murphy Police Chief William Myrick, and ten John Doe defendants (collectively, "Defendants"). In their complaint, the Cantrells set forth three claims for relief under 42 U.S.C. § 1983 in which they generally allege that, as a result of their actions on October 2, 2007, Myrick, McGee, Dacey and Barber violated their Fourth, Fifth, and Fourteenth Amendment rights. The Cantrells also presented three claims for relief in which they broadly averred that the City "developed and maintained customs, policies and practices exhibiting deliberate indifference to the constitutional rights of its citizens." Finally, they asserted four negligence claims against Defendants.

On November 25, 2009, the City, Myrick, McGee, Dacey and Barber (collectively, "City Defendants") filed a "motion to dismiss, or in the alternative, motion for summary judgment."[5] In their motion, the City Defendants sought dismissal of all claims against them and any John Does associated with the City. In support of their request, they maintained that: (1) Myrick, McGee, Dacey and Barber (collectively, "Officer Defendants") were entitled to qualified immunity

---

[5] East Texas Medical Center did not join this motion.

on the Cantrells' constitutional claims against them; (2) the Cantrells failed to state a viable *Monell* claim against the City; (3) Texas law barred the negligence claims against the Officer Defendants; (4) the doctrine of sovereign immunity barred the negligence claims against the City; and (5) the claims against any John Does were barred by the statute of limitations.

In October 2010, the district court granted the City Defendants' motion by: (1) concluding that the Officer Defendants were entitled to qualified immunity on the Cantrells' "state created danger" theory of relief; (2) determining that a portion of the Cantrells' Fourth Amendment claim failed as a matter of law because the officers had probable cause to detain Ave at her home; and (3) holding that the negligence claims were barred by state law. It also ruled in the City Defendants' favor by holding that the claims against any John Does were barred by the statute of limitations, and concluding that the claims against Barber and Myrick had been abandoned.

The district court, however, denied the City Defendants' motion in two important respects. First, it rejected the Officer Defendants' qualified immunity defense on both the Cantrells' "special relationship" theory of relief under the Due Process Clause and their assertion that Ave's detention at the police station violated her Fourth Amendment rights. Second, the district court concluded that the Cantrells had stated a viable *Monell* claim, and that it was premature to grant the City summary judgment on this issue. The remaining defendants–the City, Dacey, and McGee–subsequently filed a timely notice of interlocutory appeal.[6]

---

[6] The Cantrells filed a notice of cross-interlocutory appeal in November 2010. The following month, the City, McGee, and Dacey filed a motion to dismiss the cross appeal based on a lack of appellate jurisdiction. In January 2011, this motion was granted.

No. 10-41138

## II.

On appeal, Dacey and McGee (the "Officers") contend that the district court erred in not granting them qualified immunity on the Cantrells' due process and Fourth Amendment claims. We review each contention separately.[7]

## A.

Because the district court denied qualified immunity on the Cantrells' due process claim based on the pleadings, we will apply the standard of review that governs such a denial.

"We have appellate jurisdiction to review a district court's order denying a motion to dismiss on the basis of qualified immunity to the extent that it turns on an issue of law." *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008) (citing *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 251 (5th Cir. 2005)). "We review the district court's denial of the qualified immunity defense de novo, accepting all well-pleaded facts as true and viewing them in the light most favorable to the plaintiff." *Id.* (citation omitted). When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (citation omitted).

Before the district court, the Cantrells argued that the Officers deprived Matthew of his due process rights "by interfering with attempts to perform life saving measures and by failing to perform such measures themselves." They contended that the Officers "created a special relationship with Matthew when

---

[7] The City also attempts to appeal the district court's judgment insofar as it preserved the Cantrells' *Monell* claim. In its brief, however, the City does not point to any part of the record establishing that the district court designated this issue as appealable under 28 U.S.C. § 1292(b). Nor does it suggest that some other statutory exception to the final judgment rule applies. Since this issue does not involve the denial of qualified immunity on an issue of law, it also does not fall under the *Mitchell* exception to the final judgment rule. We therefore lack jurisdiction to decide this issue. The appeal of the district court's order as it relates to the *Monell* claim is dismissed. *See Kinney v. Weaver*, 367 F.3d 337, 347 n.10 (5th Cir. 2004).

they separated him from his mother," and that "this relationship imposed a duty upon them to care for and protect Matthew from his death." The Officers breached this duty, the Cantrells maintained, "by failing to administer aid and by delaying treatment from paramedics."

Relying upon case law involving children in foster care, the district court agreed with the Cantrells and implicitly concluded that a "special relationship" existed between the Officers and Matthew. It then went on to hold that the Cantrells had "stated claims based on a special relationship between Matthew and the City Defendants." After noting that a successful substantive due process claim requires, at minimum, deliberate indifference towards a plaintiff, the district court also determined that the Cantrells had "established a genuine issue of material fact as to whether the City Defendants acted with deliberate indifference."

On appeal, the Officers argue that the district court erred in concluding that the "special relationship" exception to the rule set forth in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989) applies in this case. The Officers contend that this exception does not apply, and therefore could not clearly establish that they had a duty towards Matthew. As a result, the Officers urge us to conclude that they are entitled to qualified immunity. Prior to considering *DeShaney* and its application in this context, we set forth the legal background that governs our review of this issue.

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court articulated a mandatory two-step sequence for resolving government officials' qualified immunity claims. "*Saucier* required that lower courts consider first, whether the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law, and second, if a violation has been alleged, whether the right was clearly established at the time of the alleged government misconduct." *Wernecke v. Garcia*, 591 F.3d 386,

No. 10-41138

392 (5th Cir. 2009) (internal citations and quotation marks omitted). In *Pearson v. Callahan*, the Court reconsidered the *Saucier* procedure, determined that "while the [two-step] sequence . . . is often appropriate, it should no longer be regarded as mandatory," and gave lower courts "permi[ssion] to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. 223, 236 (2009).

"To be 'clearly established' for purposes of qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Kinney*, 367 F.3d at 349-50 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The clearly established standard does not mean that officials' conduct is protected by qualified immunity unless the very action in question has previously been held unlawful." *Wernecke*, 591 F.3d at 393 (internal quotation marks and citation omitted). Indeed, "[t]here need not be commanding precedent that holds that the very action in question is unlawful; the unlawfulness need only be readily apparent from relevant precedent in sufficiently similar situations." *Brown*, 519 F.3d at 236-37 (internal quotation marks and citations omitted).

What clearly established means depends largely upon the level of generality at which the relevant legal rule is to be identified. *Wernecke*, 591 F.3d at 393 (citing *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). "[A]n official does not lose qualified immunity merely because a certain right is clearly established in the abstract." *Kinney*, 367 F.3d at 350. "Officials should receive the protection of qualified immunity unless the law is clear in the more particularized sense that reasonable officials should be on notice that their conduct is unlawful." *Wernecke*, 591 F.3d at 393 (internal quotation marks and citations omitted). With this background in mind, we now turn to considering the specific legal right the Cantrells allege was violated by the Officers.

11

No. 10-41138

In *DeShaney*, the Supreme Court stated that its cases "have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." 489 U.S. at 196. The Court then went on to hold that, as a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

The Court did, however, recognize an exception where in "certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. In attempting to define those limited circumstances, the Court briefly discussed its decisions in *Estelle v. Gamble*, 429 U.S. 97 (1976) and *Youngberg v. Romeo*, 457 U.S. 307 (1982). After doing so, it noted that these two cases, when read together, "stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 198-99. The Court provided the following rationale for this principle:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs–*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney*, 489 U.S. at 200.

In concluding its discussion of what has since been recognized as the "special relationship" exception to *DeShaney*'s general holding, the Court stated that, "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf–through

12

incarceration, institutionalization, or other similar restraint of personal liberty–which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* Since *DeShaney*, we have recognized the validity of the special relationship exception to the general *DeShaney* rule. *See, e.g., McClendon*, 305 F.3d at 325 (noting that while we have recognized the special relationship exception, we have not recognized the "state-created danger" exception to the general *DeShaney* rule).

Seeking to avail themselves of the *DeShaney* special relationship exception, the Cantrells argue that, like individuals who are in foster care or who are otherwise in the custody of the state, Matthew had a special relationship with the Officers. According to the Cantrells, this special relationship, along with a corresponding duty of care and protection, was created when the Officers took "custody" of Matthew by physically separating him from his mother. The Officers breached this duty, the Cantrells contend, when the Officers failed to administer aid and delayed treatment from paramedics. In rejecting the Officers' request for qualified immunity, the district court agreed with the Cantrells' analogy to cases involving foster care.

Taking the allegations in the Cantrells' complaint as true, we conclude that they have failed to satisfy their burden of demonstrating the inapplicability of the Officers' qualified immunity defense. In their brief, they fail to cite any cases involving sufficiently similar situations that would have provided reasonable officers with notice that they had an affirmative constitutional duty to provide medical care and protection to a young child when they temporarily physically separate the child from his mother. While the Cantrells analogize to cases involving foster care in arguing that Matthew's putative right was clearly established, this line of cases is materially distinguishable, and therefore could not have provided reasonable officials in the Officers' position with notice that

No. 10-41138

they had an affirmative constitutional duty to provide medical care and protection to Matthew. Stated differently, Matthew's asserted right was not clearly established on October 2, 2007. Because this putative right was not clearly established, the Officers are entitled to qualified immunity. The district court therefore erred in holding to the contrary.

### B.

In denying qualified immunity on a portion of the Cantrells' Fourth Amendment claim, the district court applied Federal Rule of Civil Procedure 56. We will therefore apply the standard of review that governs denials of motions for summary judgment based upon qualified immunity.

While ordinarily courts of appeals may not review interlocutory decisions of lower courts, "the Supreme Court has held that the denial of a motion for summary judgment based upon qualified immunity is a collateral order capable of immediate review." *Kinney*, 367 F.3d at 346 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). "Our jurisdiction is significantly limited, however, for it extends to such appeals only 'to the extent that [the denial of summary judgment] turns on an issue of law.'" *Id.* (quoting *Mitchell*, 472 U.S. at 530).

"In denying a motion for summary judgment on qualified immunity grounds, the district court makes two determinations: first, whether 'a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law,' and second, whether 'a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct.'" *Wernecke*, 591 F.3d at 391 (quoting *Kinney*, 367 F.3d at 346). "We have jurisdiction to review the first type of determination–'the purely legal question whether a given course of conduct would be objectively unreasonable in light of clearly established law'–but we may not review the second type of determination–'the district court's assessments regarding the sufficiency of the evidence.'" *Id.* (quoting *Kinney*, 367 F.3d at 346-47). Stated differently, "we

14

No. 10-41138

have jurisdiction only to decide whether the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on a given set of facts." *Id.*

When considering an appeal from the denial of qualified immunity, our inquiry does not seek to determine disputed issues of fact. *Id.* Rather, our inquiry concerns the purely legal question of whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record. *Id.* In ruling on this question, we must assume that the plaintiffs' version of the facts is true. *Id.* at 392 (citing *Wagner v. Bay City, Tex.*, 227 F.3d 316, 320 (5th Cir. 2000)). "While ordinarily our standard of review on a denial of summary judgment would be de novo, applying the same standard as the district court, the standard changes because we lack jurisdiction, in the qualified immunity context, to review the decision that a factual dispute exists." *Id.* (citation omitted). "Instead, we consider 'whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment.'" *Id.* (quoting *Kinney*, 367 F.3d at 348). Our review of the legal significance of the facts is de novo. *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007).

Before considering the Officers' argument on appeal, we must first ensure that our jurisdiction is secure. After reviewing the district court's order, we conclude that it is. Because the district court's denial of summary judgment was based on a determination regarding the legal significance of facts the district court found to be supported by the summary judgment record, we have jurisdiction to consider this issue. *Freeman*, 483 F.3d at 410.

In what remains of their Fourth Amendment claim, the Cantrells challenge the legality of Ave's detention at the police station. On appeal, the Officers contend that the district court erred in not granting them summary

15

judgment on this portion of the Cantrells' Fourth Amendment claim. Specifically, they argue that Murphy officials had probable cause to take Ave to the police station because: (1) her suicidal statements indicated that she posed a direct threat to her personal safety; and (2) other statements made by Ave, along with the circumstances and information possessed by Murphy officials, established probable cause to believe that Ave may have committed a crime.

We apply a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. "First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." *Freeman*, 483 F.3d at 410. "If so, we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* at 411. "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.* Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson*, 555 U.S. at 236.

For purposes of our qualified immunity analysis, we will assume that the Officers were involved with Ave's detention. We make this assumption because, under the current state of the record, there is nothing establishing that they were involved with her detention.  Even with this favorable assumption, however, the Cantrells are unable to show that the Officers are not entitled to qualified immunity on what remains of their Fourth Amendment claim.

Put simply, the Officers are entitled to qualified immunity because they had probable cause to detain Ave.  In Texas, a peace officer may, without a warrant, take a person into custody if (1) the officer has reason to believe and

does believe that a person is mentally ill and because of that illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody. Tex. Health & Safety Code § 573.001. The Texas Code defines mental illness as an illness, disease, or condition, other than epilepsy, senility, alcoholism, or mental deficiency, that (1) substantially impairs a person's thought, perception of reality, emotional process, or judgment; or (2) grossly impairs behavior as demonstrated by recent disturbed behavior. *Id.* § 571.003.

Based on the suicidal statements made by Ave at her home, a reasonable officer would have had probable cause to take Ave into protective custody under Texas law.[8] As applied in this context, probable cause exists where the facts and circumstances within the officer's knowledge at the time of the seizure are sufficient for a reasonable person to conclude that an individual is mentally ill and poses a substantial risk of serious harm. *Cf. Freeman*, 483 F.3d at 413 (defining probable cause in the criminal context).

Here, Ave's statements and general demeanor at her home could have provided a reasonable officer with a sufficient basis to conclude that she was in a condition that substantially impaired her "emotional process" or judgment, and thus was mentally ill under Texas law. *See* Tex. Health & Safety Code § 573.001(c) (stating that a peace officer may form the belief that a person meets the criteria for apprehension "on the basis of the conduct of the apprehended person or the circumstances under which the apprehended person is found").

---

[8] The probable cause standard applies in the context of a seizure of the mentally ill. *See, e.g., Maag v. Wessler*, 960 F.2d 773, 776 (9th Cir. 1991) (citing cases). The application of the probable cause standard in this context is further supported by the Supreme Court's decision in *Dunaway v. New York* 442 U.S. 200, 214 (1979), which stands for the general proposition that a Fourth Amendment seizure is reasonable only if supported by probable cause.

Moreover, her suicidal comments could have also given a reasonable officer a sufficient basis to believe that she was a danger to herself. As such, a reasonable officer could have concluded that Ave was eligible for emergency detention under Texas law. Accordingly, the Officers had probable cause to detain Ave and take her into protective custody. In two unpublished cases, we have reached a similar conclusion in factually analogous situations. *See Sullivan v. Cnty. of Hunt, Tex.*, 106 F. App'x 215 (5th Cir. 2004) (holding that officers were entitled to qualified immunity because they had probable cause to detain an individual who was a suicide risk); *Martinez v. Smith*, 200 F.3d 816 (5th Cir. 1999) (concluding that officers had probable cause to take plaintiff into protective custody based on their belief that she posed a danger to herself, and affirming the dismissal of claims against them).[9]

Because the Officers had probable cause, Ave's detention did not violate the Fourth Amendment. The district court therefore erred in not granting the Officers summary judgment on this portion of the Cantrells' Fourth Amendment claim.

## III.

For these reasons, we REVERSE the district court's judgment denying qualified immunity. This case is REMANDED to the district court for proceedings consistent with this opinion.

---

[9] Given this conclusion, we will not consider whether the Officers had probable cause to seize Ave based on the belief that she had committed a criminal act.