# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 1, 2014

Lyle W. Cayce
Clerk

No. 13-41088

UNITED STATES OF AMERICA, ex rel; M.D. DAKSHESH KUMAR PARIKH; M.D. HARISH CHANDNA; M.D. AJAY GAALLA,

Plaintiffs–Appellees

UNITED STATES OF AMERICA,

Intervenor–Appellee

v.

DAVID BROWN; DR. WILLIAM CAMPBELL,

Defendants–Appellants

Appeal from the United States District Court
for the Southern District of Texas
U.S.D.C. No. 6:10-CV-64

Before SMITH, WIENER, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:[*]

IT IS ORDERED that the petition for panel rehearing is GRANTED and the opinion previously filed in this case is WITHDRAWN. The following opinion is substituted therefore:

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-41088

In this False Claims Act ("FCA") qui tam suit, relators Drs. Dakshesh Parikh, Harish Chandna, and Ajay Gaalla (collectively, the "Relators") sued Citizens Medical Center ("CMC"), David Brown ("Brown"), and Dr. William Campbell, Jr. ("Campbell"). Brown and Campbell (collectively, "Appellants") moved to dismiss the complaint based upon qualified immunity, and the district court denied the motion. We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Relators are cardiologists who formerly practiced at CMC. CMC is a county-owned hospital in Victoria, Texas. Brown is the hospital's administrator, and Campbell is a cardiologist employed by the hospital. As Brown and Campbell are the only defendants in this appeal, we briefly summarize the facts and proceedings that pertain to them.

In their complaint, Relators alleged Appellants committed numerous FCA violations concerning improper incentives for patient referrals. The alleged FCA violations fall into three general categories.

First, Relators alleged that CMC, at Brown's direction, knowingly and willfully paid bonuses to emergency room physicians in exchange for referral of Medicare and Medicaid patients to CMC's chest pain center. Specifically, the bonuses were paid by way of an equal split, between CMC and the referring emergency room physicians, of the chest pain center revenues. The bonuses were thus tied to the "volume, value, and revenue generated" from these referrals, which made up the entirety of the chest pain center's patients. Brown "personally designed" this bonus system and was in charge of implementing and administering it.

Second, Relators alleged that Brown offered, and Campbell accepted, an above-market guaranteed salary and discounted office space rental in exchange for Medicare and Medicaid patient referrals to CMC. CMC paid Campbell "many times more in salary than [he] earned in private practice" and

rented office space to Campbell "at a significantly reduced rate below the fair market value." Prior to this arrangement, Campbell transferred Medicare and Medicaid patients out of CMC to other hospitals for treatment. Once he entered this arrangement, however, he began referring "nearly all Medicare and Medicaid heart surgery patients to CMC and its exclusive cardiac surgeon."

Third, Relators alleged that Brown implemented a bonus system wherein gastroenterologists who participated in CMC's colonoscopy screening program received bonus compensation for referring patients to CMC. Specifically, CMC operated a program offering insured patients, including Medicare and Medicaid patients, colonoscopy screenings. A gastroenterologist would be assigned to a screening day and would perform the screenings for that day. The gastroenterologist would then be compensated by billing any charges to the patients' insurer, and CMC would be compensated by billing separately for its hospital charges. CMC also compensated the gastroenterologist an additional $1,000 "directorship" fee for each day the gastroenterologist participated in the screening program. But Relators alleged that the gastroenterologist did not assume any "additional work or oversight" to receive the directorship fee—"[t]here are absolutely no director responsibilities or duties for participating physicians." Because Brown awarded more screening days to physicians who referred more patients to CMC, screening gastroenterologists received bonuses tied to the number of patients referred to CMC.

Based upon these allegations, Relators asserted causes of action under the FCA. According to Relators' complaint, Appellants submitted, or conspired to submit, claims for payment from Medicare and Medicaid for these services in violation of the FCA because such claims were knowingly falsely certified to be in compliance with healthcare laws and regulations. Relators alleged that

No. 13-41088

Appellants knew that these *quid pro quo* arrangements violated the Anti-kickback Statute ("AKS") for federal health care programs, 42 U.S.C. § 1320a–7b, and the Stark Law, 42 U.S.C. § 1395nn, which prohibits submitting claims to federal health care programs if the services were furnished pursuant to referrals from physicians with whom the servicing entity has a financial relationship.

Brown and Campbell moved to dismiss the complaint based upon qualified immunity. The district court denied the motion, finding qualified immunity categorically unavailable against FCA claims. Brown and Campbell timely appeal.

## II.   JURISDICTION AND STANDARD OF REVIEW

To the extent an order denying qualified immunity turns on an issue of law, this court has jurisdiction to consider an interlocutory appeal of that order. *Cantrell v. City of Murphy*, 666 F.3d 911, 918 (5th Cir. 2012). We review *de novo* the denial of a motion to dismiss based upon qualified immunity grounds. *Id.* In so doing, we accept all well-pleaded facts as true and draw all reasonable inferences in favor of the nonmoving party. *Id.*

## III.   DISCUSSION

The parties largely dispute the categorical availability of qualified immunity against FCA suits, but we expressly decline to resolve this dispute. Instead, assuming *arguendo* that qualified immunity is an available defense, we hold on the merits that Brown and Campbell are not entitled to qualified immunity against these FCA claims.

The FCA permits the United States, or a private person on the government's behalf (a "relator"), to sue a person who has presented a false claim for payment to the United States. 31 U.S.C. §§ 3729(a), 3730(b). Liability attaches to any person who, *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or

4

No. 13-41088

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* §§ 3729(a)(1)(A), 3729(a)(1)(B). The FCA defines "knowingly" to mean that the defendant "has actual knowledge of the information" underlying the claim, "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). A defendant found liable may be subject to civil penalties and treble damages. *Id.* § 3729(a)(1). *See generally United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 364 (5th Cir. 2014).

Qualified immunity shields from suit all but the "plainly incompetent or those who knowingly violate the law." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citation and internal quotation marks omitted). The plaintiff must bear the burden of proving, in two familiar steps, that a government official is not entitled to qualified immunity. *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). First, a plaintiff must show that he "plead[ed] facts showing . . . that the official violated a statutory or constitutional right." *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Atteberry*, 430 F.3d at 253. If the plaintiff makes this first showing, then the second step is to determine whether "the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Atteberry*, 430 F.3d at 253. Courts have discretion to decide which of the two prongs of qualified immunity to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Both prongs are met here.

## A. Statutory Violation

Relators have borne their burden on the first step of the qualified immunity analysis. As the district court found, Relators sufficiently pleaded that Appellants violated the FCA by submitting, or conspiring to submit,

claims for payment while knowingly falsely certifying compliance with the AKS and the Stark Law. Brown and Campbell do not dispute the sufficiency of the complaint in this regard.

We take these well-pleaded facts as true—including the well-pleaded fact that Appellants knowingly falsely certified compliance with the AKS and the Stark Law—and inquire next whether it was clearly established at the time that such a claim for payment violated the FCA.

## B. Objectively Unreasonable in Light of Clearly Established Law

The courses of conduct allegedly taken by Brown and Campbell were objectively unreasonable in light of clearly established law. A defendant's conduct is objectively unreasonable when, at the time of the challenged conduct, the contours of the violated right were "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al–Kidd*, 131 S. Ct. at 2083 (citation and internal quotation marks omitted). Although "the term clearly established does not necessarily refer to commanding precedent that is factually on all-fours with the case at bar," *Atteberry*, 430 F.3d at 256 (citation and internal quotation marks omitted), "existing precedent must have placed the statutory or constitutional question beyond debate," *al–Kidd*, 131 S. Ct. at 2083 (citation omitted).

Appellants argue that the alleged violations of the AKS and the Stark Law were not clearly established at the time of the instant offenses. However, such an argument presumes that Relators asserted causes of action under the AKS and Stark Law, but they have not. Although AKS and Stark Law violations underlie Relators' FCA claims, we do not focus on these underlying violations.[1] After all, "the [FCA] attaches liability . . . to the claim for

---

[1] The pleadings before us would also support the conclusion that Appellants' course of conduct was in clear violation of the AKS and the Stark Law. *See, e.g., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (noting that

payment," "not to the underlying fraudulent activity." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009) (citation and internal quotation marks omitted). Properly focused on the claim for payment here, the relevant pleading that we have taken as true is that Appellants *knew* their compliance certification was false.

Importantly, taking all reasonable inferences in favor of the Relators as we must, Relators' pleadings allege a simple, brazen kickback scheme: Brown and Campbell directed CMC to pay doctors cash bonuses and other benefits in exchange for referrals of Medicare and Medicaid patients. These factual allegations support the Relators' claim that, when Brown and Campbell certified compliance with the AKS and the Stark Law, they "knowingly *and willfully* made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to the government." The FCA punishes "knowingly" making a false claim, which includes (1) acting with actual knowledge of falsity (2) with deliberate indifference toward the truth or falsity

---

the Stark Law "prohibits physicians from referring Medicare patients to an entity for certain 'designated health services,' including inpatient and outpatient hospital services, if the referring physician has a nonexempt 'financial relationship' with such entity" and the AKS prohibits "(1) the solicitation or receipt of remuneration in return for referrals of Medicare patients, and (2) the offer or payment of remuneration to induce such referrals"); *United States v. Rogan*, 459 F. Supp. 2d 692, 711 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) ("The Stark Statute establishes the clear rule that the United States will not pay for items or services ordered by physicians who have improper financial relationships with a hospital."); Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 66 Fed. Reg. 856-01, 871–80 (Jan. 4, 2001) (clarifying definitions of, *inter alia,* referral and physician compensation). Appellants argue that these statutes are "confusing, complicated, over-reaching, too complex, and intrusive," as well as "ambiguous; arcane; and very vague." Steven D. Wales, *The Stark Law: Boon or Boondoggle? An Analysis of the Prohibition on Physician Self-Referrals*, 27 L. & Psychol. Rev. 1 (2003) (cited by Appellants). We can imagine situations that implicate these statutes' complexity—where due to the laws' exceptions or safe harbor provisions the alleged unlawful conduct was reckless or inadvertent. But according to the factual allegations, the Appellants in this case allegedly perpetrated an audacious kickback scheme. This conduct is at the core of the prohibitions of the FCA, the Stark Law, and the AKS. This is not a case at the margins where qualified immunity may apply, an issue on which we express no opinion.

or (3) with reckless disregard of the truth or falsity of the information provided. *Longhi*, 575 F.3d at 465. Because the well-pleaded complaint alleges that Brown and Campbell certified claims with "actual knowledge of their falsity," we need not address the more difficult question whether qualified immunity may be available for other FCA violations on a lesser scienter showing, namely deliberate indifference or recklessness.

The key question, then, is whether the contours of the FCA were sufficiently clear at the time such that every reasonable official would have understood that—as Relators pleaded in their complaint—presenting claims for payment, while knowingly falsely certifying compliance with the AKS and Stark Law, violated the FCA. Based on circuit precedent, we answer in the affirmative.

In *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997), this court considered whether a claim for services rendered in violation of the AKS and the Stark Law constituted a false claim within the purview of the FCA. *Id.* at 901–03. We first noted that "claims for services rendered in violation of a statute do not *necessarily* constitute false or fraudulent claims under the FCA." *Id.* at 902 (emphasis added). However, under a false certification theory, the FCA may be implicated "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation." *Id.* In this scenario, "a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *Id.* We then found that the relator had alleged (1) "as a condition of their participation in the Medicare program, defendants were required to certify in annual cost reports that the services identified therein were provided in compliance with the laws and regulations regarding the provision of healthcare services," and (2) "defendants falsely certified that the services identified in their annual cost reports were provided

8

in compliance with such laws and regulations." *Id.* This, we held, stated a cognizable cause of action under the FCA. *Id.* at 902–03.

In light of our decision in *Thompson*, every reasonable official would understand that the FCA is violated when (1) "the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation," and (2) the official "falsely certifies compliance with that statute or regulation." *Id.* at 902. This clearly established statutory right is precisely what Relators alleged Appellants to have violated.

Accordingly, we hold that as a matter of law Brown and Campbell are not entitled to qualified immunity.[2]

## IV. CONCLUSION

We AFFIRM the district court's denial of Brown and Campbell's motion to dismiss based upon qualified immunity.

---

[2] Relators also alleged that Brown and Campbell violated the FCA "directly" by providing unnecessary or worthless medical services. Because Brown and Campbell do not assert qualified immunity as to these claims, we need not address the matter.