# United States Court of Appeals
## For the First Circuit

No. 12-2243

PHL VARIABLE INSURANCE COMPANY,

Plaintiff, Appellee,

v.

THE P. BOWIE 2008 IRREVOCABLE TRUST,
by and through its trustee, Louis E. Baldi,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Jesus E. Cuza Abdala, with whom Ina M. Berlingeri Vincenty and Holland & Knight LLP were on brief, for appellant.
Jessica Lynne Wilson, with whom Thomas F. A. Hetherington, Jarrett E. Ganer, Edison, McDowell & Hetherington LLP, Stephen M. Prignano, Raymond M. Ripple, and Edwards Wildman Palmer LLP were on brief, for appellee.

May 13, 2013

**LYNCH, Chief Judge**.  This is an appeal from a grant of summary judgment in favor of plaintiff PHL Variable Insurance Company ("PHL") in its equitable action for rescission of a life insurance policy and special damages incident to the rescission of that policy.  See PHL Variable Ins. Co. v. P. Bowie 2008 Irrevocable Trust, 889 F. Supp. 2d 275 (D.R.I. 2012).  The district court found that the defendant, The P. Bowie 2008 Irrevocable Trust ("the Trust"), by and through its trustee, Louis E. Baldi, had made false representations to induce PHL to issue the policy, and that this fraud caused PHL damages that would not be fully compensated by rescission alone.  The court allowed PHL to retain the policy premium paid by the Trust in order to offset PHL's losses and to return the parties to the status quo ante.

The Trust argues on appeal that the district court erred, under Rhode Island law, in allowing PHL to both rescind the policy and retain the premium.  It also argues that the question of whether the Trust made fraudulent misrepresentations was legally irrelevant to the rescission action, and, in any event, that the Trust did not commit fraud.  The Trust asks this court to reverse the grant of summary judgment for PHL and to enter judgment for the Trust.

The court committed no errors of law, did not err in finding that the plaintiff was a victim of a fraudulent insurance

-2-

scheme, and appropriately exercised its equity powers. Under Rhode Island principles of equity, we affirm.

## I.

On February 28, 2008, an insurance broker, Richard Rainone, submitted an application from Peter Bowie to PHL for a life insurance policy on Bowie's life. Bowie's application represented that he was a self-employed real estate investor with a net worth of $7.5 million and an earned income of $250,000 per year. He sought to take out a $5 million policy. Rainone's letter accompanying the application stated that, upon a formal offer of a policy from PHL, the policy would be re-issued into a trust.

PHL then began its underwriting investigation, which included a third-party inspection by a vendor, Examination Management Services, Inc. ("EMSI"). EMSI contacted Bowie on March 14, 2008. Bowie told the EMSI inspector that his earned income was $250,000 per year and that his net worth was $7.35 million. He also stated that a trust would be the beneficiary of the policy. Based on the available information, PHL offered Bowie a $5 million policy on April 23, 2008.

On April 28, 2008, Rainone submitted a revised application that listed the Trust as the owner and sole beneficiary of the proposed policy.[1] Baldi, an attorney, acted for the Trust.

---

[1] The named beneficiary of the Trust was Bowie's wife, Elaine Bowie.

-3-

The second application repeated the same information about Bowie's employment, net worth, and income. The application also answered "no" to all of the following questions:

> Will any of the first year or subsequent premiums for the policy be borrowed by the proposed owner or proposed insured or by any other individual, trust, partnership, corporation or similar related entity?

> Will the owner, now or in the future pay premiums funded by an individual and/or entity other than the proposed insured?

> Is the policy being purchased in connection with any formal or informal program under which the proposed owner or proposed insured have been advised of the opportunity to transfer the policy to a third party within five years of its issuance?

> Does the proposed insured or proposed owner have any understanding or agreement providing for a party, other than the owner, to obtain any legal or equitable right, title or interest in the policy or entity owning the policy?

Attorney Baldi (on behalf of the Trust), the broker Rainone, and Bowie all signed the April 28 application. Baldi signed under an attestation stating: "I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured . . . are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded." Additionally, all three individuals signed a separate Statement of Client Intent, which also attested that the premium payments would

-4-

not be borrowed and would be paid from Bowie's current income and/or his own cash and equivalents. The Statement represented that the purpose of the policy was estate planning and that there was no intent to transfer the policy.

On May 5, 2008, PHL approved a $5 million policy ("the Policy") on Bowie's life, pursuant to the April 28 application. On May 14, 2008, Bowie and Baldi signed a Policy Acceptance Form, which stated that "[t]he Insured(s) declares that the statements made in the application remain full, complete, and true as of this date." Also on May 14, Baldi wrote a check from his client account to PHL for the Policy premium, in the amount of $192,000. On May 15, 2008, PHL paid Rainone a commission of $172,365.

As it turned out, almost all of the representations made to PHL were patently untrue. Notably, Bowie, Rainone, and Rainone's business partner, Christopher Vianello, all invoked their Fifth Amendment privilege not to testify in this case. Nonetheless, discovery showed the following facts.

Bowie was not a wealthy real estate investor, but rather a retired city employee, used car salesman, and blackjack dealer. He could not afford to pay the Policy premium on his own. Instead, the plan to pay the premium had originated with brokers Rainone and Vianello, who began negotiating with Imperial Premium Finance, LLC[2]

---

[2] This company also appears in the record as Imperial Finance and Trading and as Imperial Holdings, Inc.

("Imperial") even before filling out the original February 28 application. Imperial is a company whose business model consists of lending money to pay for life insurance policy premiums and, when borrowers default on those loans, taking possession of the policies as collateral.[3] This arrangement allows Imperial to attempt to avoid the longstanding legal prohibition on holding a life insurance policy on a life in which the owner has no insurable interest.[4] See Warnock v. Davis, 104 U.S. 775, 779 (1881).

Here, the plan was for Imperial to finance the premiums on Bowie's Policy and, in return, take a security interest in the Policy. This plan was directly contrary to the multiple representations in the application documents that Bowie himself would pay the premiums and that there was no plan for any third party to obtain an interest in the Policy.

The Trust, by and through Baldi, was the mechanism for accomplishing this insurance fraud. Before being deposed in this lawsuit, Baldi had never met or even spoken to Bowie. Baldi came

---

[3] The 2011 prospectus that Imperial filed with the Securities and Exchange Commission demonstrates that default and foreclosure are the overwhelmingly likely outcomes of an Imperial loan. Of its loans that matured between January and September of 2010, 97% were not repaid in cash.

[4] Some states, including Rhode Island, have identified practices like Imperial's as fraudulent. See R.I. Gen. Laws § 27-72-2(9)(i)(A)(X), -2(26). While Rhode Island did not enact its statute against such practices until after the conduct alleged in this case, the statute is instructive in lending context to the transactions.

to be trustee of the Trust at the request of Rainone and Vianello. When he spoke with Rainone and Vianello about the Policy, Baldi did not inquire as to the purpose of the Trust, his responsibilities as trustee, the basis for any of the representations in the April 28 application, what the Policy premiums would be, or how the premiums would be paid. Baldi did not see Bowie sign the application.

Baldi testified that he did not know where the money for the May 14, 2008 premium check from his lawyer's account had come from -- that "somebody" must have deposited it into his account. In fact, Baldi's bank records show that Vianello had endorsed over to Baldi a cashier's check payable to Vianello for the entire $192,000.

On May 26, 2008 -- twelve days after Baldi and Bowie had executed the Policy Acceptance Form -- Baldi, on behalf of the Trust, entered a loan agreement with Imperial. The agreement provided that Imperial would loan $189,000 to the Trust, at a floating interest rate starting at more than 12 percent, for the express purpose of paying premiums on the Policy. In addition, Imperial charged a $19,400 origination fee and a $48,164.83 "lender protection insurance charge." The loan was set to mature on July 26, 2010. In short, the terms of the loan virtually dictated that it could not be paid back. The Policy served as collateral in the event of default.

On June 13, 2008, Imperial deposited $189,050 into Baldi's account, and on June 17, Baldi wrote a check to Vianello for $186,550, "to repay for the premium." Baldi testified that he wrote this check at Vianello's direction. He never inquired as to why he should make out the check to Vianello or whether the Trust instrument authorized Vianello to direct Baldi to make such payments.

Baldi never notified PHL that the representations in the application regarding the identity of the premium payor were no longer accurate; in fact, he claimed to have no awareness that the Policy had any restrictions on premium financing. He also never notified PHL of the assignment of an interest in the Policy to Imperial, although the Policy included a requirement for such notice.

On August 19, 2008, Baldi, on behalf of the Trust, signed an amendment to the Trust instrument that appointed an "Independent Professional Trustee" ("IPT") to serve as co-trustee with Baldi. Baldi claimed that he could not remember whether it was PHL or Imperial that had required the appointment of a co-trustee. The amendment provided that in the event of default on the Imperial loan, the IPT was required to assign the Policy to Imperial. An Amended and Restated Trust Agreement, dated October 6, 2008 and signed by Bowie, Baldi, and the IPT, added a requirement that, if the Policy were rescinded and the premiums refunded to the Trust

while any Policy loan was outstanding, the IPT would deliver the refund to Imperial.[5]

On August 20, 2008, Rainone signed an agreement with Imperial to pay the company a percentage of his commission from the Bowie Policy, in the amount of $67,025.[6] Rainone entered this agreement despite the fact that he had signed a Producer's Report for PHL, submitted with the Bowie application, stating that "no person other than the undersigned shall profit by any commission on insurance issued on this application."

Early in 2010, PHL attempted to contact the Trust, Bowie, and Rainone regarding the information in the application. It received no response; meanwhile, its own investigation indicated that the information had been falsified. PHL then filed the instant suit.

II.

PHL filed its complaint in the U.S. District Court for Rhode Island on February 19, 2010, invoking the court's diversity jurisdiction. PHL sought a declaratory judgment that the Policy was null, void, and rescinded ab initio due to the Trust's fraudulent misrepresentations. It also sought to retain the

_____

[5] Significantly, the Trust's litigation expenses in this action have been paid with another loan from Imperial.

[6] The agreement calculated this amount based on 35% of a "Target Commission" of $191,500, which was more than the commission that Rainone actually received.

premium paid by the Trust as an "offset" against the damages it had suffered in connection with the Policy, including the costs of "underwriting and issuance of the Policy, payments of commissions and fees in connection with the issuance of the Policy, administration and servicing of the Policy, investigation of the misrepresentations and concealments [alleged in the complaint], and commencement of this action to enforce its rights." PHL stated, however, that it stood "ready, willing, and able to refund or otherwise make payment of all or any portion of the premiums paid for the Policy as directed by the Court in accordance with [PHL]'s demand for rescission of the Policy." Accordingly, PHL "fully and unconditionally tender[ed] the Policy's premiums to the Court's registry." Finally, PHL sought costs and attorneys' fees.

On March 15, 2011, during discovery, the Trust sent a letter to PHL stating that the Trust "agree[d] to rescind the Policy" and "confirm[ing] the rescission of said Policy." The Trust asserted that this agreement made the complaint moot and demanded immediate return of the premiums, as purportedly required by Rhode Island law. The parties continued with discovery, and in June and July 2011, the parties filed cross-motions for summary judgment.

After argument on the motions, the court issued a Memorandum and Order on September 5, 2012, granting PHL's motion

and denying the Trust's motion.[7] <u>PHL Variable</u>, 889 F. Supp. 2d at 284.  The court interpreted the Trust's letter of March 15, 2011, as an agreement on the issue of rescission, <u>id.</u> at 278, and it "declare[d] that the Policy is rescinded," <u>id.</u> at 279.  The court thus found that "the sole issue for the Court's consideration is whether [PHL] is required by law to return the premiums or if the Court, sitting in equity, may allow [PHL] to either retain the premiums or award [PHL] special damages in the form of retention of some or all of those premiums to offset the loss it alleges that it suffered."  <u>Id.</u> at 278.

The court noted that rescission is an equitable remedy that seeks to "restore the parties . . . to the status quo -- that is, to the respective positions they were in before [the contract was formed], <u>as if no contract existed</u>."  <u>Id.</u> at 279.  The court recognized that the general rule under Rhode Island law is that "an insurance company which has been induced to issue a policy through the fraud of the insured may, within a reasonable time after the discovery of the fraud and during the lifetime of the insured, return the consideration and rescind the contract."  <u>Id.</u> at 280 (quoting <u>Wells</u> v. <u>Great E. Cas. Co.</u>, 100 A. 395, 397 (R.I. 1917)) (internal quotation mark omitted).  Importantly, the court also explained that Rhode Island law is clear that there are exceptions

---

[7] The order also disposed of certain other motions not relevant to this appeal.

to this principle, <u>id.</u>, particularly considering that a court sitting in equity has discretion to fashion relief that "tak[es] into account special circumstances like a defendant's soiled hands," <u>id.</u> at 281 (quoting <u>Borden</u> v. <u>Paul Revere Life Ins. Co.</u>, 935 F.2d 370, 377 (1st Cir. 1991)).

The court went on to find that the Trust had engaged in fraudulent conduct. <u>Id.</u> at 281-83. While the court recognized that PHL had not pled an independent fraud cause of action, it determined that the fraud issue was pertinent to the question of the appropriate remedy and analyzed the record evidence in light of the elements of common law fraud. <u>Id.</u> at 281. The court found that Baldi, on behalf of the Trust, became aware shortly after signing the Policy documents that the statements in those documents regarding the premium payor were false, and furthermore that Baldi's conduct before he actually became so aware showed a reckless disregard for the truth. <u>Id.</u> at 282. It also found that Baldi's dealings with Imperial, Vianello, and PHL showed that Baldi intended PHL to continue relying on the false representations.[8] <u>Id.</u>

---

[8] We need not decide whether PHL's underwriting process demonstrated sufficient diligence, though the district court found it did. <u>PHL Variable</u>, 889 F. Supp. 2d at 282-83. PHL did take some steps, and even if it could have taken more, it is clear that the district court's assessment of the equities and of the Trust's soiled hands is correct on the undisputed facts.

The court held that this evidence, in sum, proved that the trust had unclean hands in the contract transaction. Id. at 283. It concluded that the law would not "allow [the Trust] to commit an intentional and calculated fraud upon [PHL] and walk away unscathed while the innocent party bears the financial burden of the fraud." Id. at 281.

The court thus ordered that PHL was entitled to retain the $192,000 premium payment as special damages. Id. at 284. We describe later the components of those damages. The court rejected the Trust's argument that such an outcome violated Rhode Island's election of remedies doctrine. Id. at 283-84; see LaFazia v. Howe, 575 A.2d 182, 184 (R.I. 1990). It emphasized that the ability to award special damages is part of an equity court's discretion to fashion relief that restores the status quo. PHL Variable, 889 F. Supp. 2d at 284.

Final judgment entered on September 17, 2012, and the Trust filed this timely appeal.

### III.

We review a grant of summary judgment de novo, "drawing all reasonable inferences in favor of the non-moving party while ignoring 'conclusory allegations, improbable inferences, and unsupported speculation.'" Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009) (quoting Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009)). We may affirm on any basis

-13-

apparent in the record.  Id.  On an appeal from cross-motions for summary judgment, the standard is the same; we view each motion separately and draw all reasonable inferences in favor of the respective non-moving party.  See OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012).

The Trust makes two general classes of arguments on appeal.  The first concerns alleged errors of Rhode Island law in the district court's decision to allow PHL to retain the premiums; the second concerns alleged errors in the finding that the Trust engaged in fraudulent conduct.[9]  We take each in turn.

A.        Rhode Island Law on Retention of Premiums

The Trust's first argument centers on what the Trust characterizes as Rhode Island's "tender back rule."  According to the Trust, a party who seeks rescission of a contract -- even when that contract was procured by fraud which imposes losses -- is always required to return the entire consideration received under the contract to the other party, under all circumstances.

This argument is based on an erroneous reading of Rhode Island law.  The cases primarily relied upon by the Trust do not stand for such a broad and inflexible proposition.  Rather, a court sitting in equity under Rhode Island law has the power to make

---

[9] The Trust does not contest that part of the Memorandum and Order declaring the Policy rescinded.

-14-

whole a party who seeks rescission of a contract procured by fraud, and that is exactly what the district court did.

In Wells v. Great Eastern Casualty Co., 100 A. 395, a beneficiary of an insurance policy sued the insurer for policy benefits, and one of the insurer's defenses was that it had rescinded the contract before the death of the insured, based on the insured's fraudulent misrepresentations. Id. at 395-96. At the time of the suit, the insurer had already returned the policy premiums. Id. at 396. It was in this context that the Rhode Island Supreme Court stated that "upon the discovery of the false and fraudulent nature of a material statement contained in [an insurance] application . . . , the [insurer is] entitled to return the premiums paid and rescind the contract of insurance" -- in other words, it found that the insurer's actions were a valid defense to a suit on the policy. Id. The court did not hold that the insurer's actions were the only way to effect rescission.

Similarly, in Pelletier v. Phoenix Mutual Life Insurance Co., 141 A. 79 (R.I. 1928), the Rhode Island Supreme Court stated that an insured's release of a claim under an insurance policy "is a bar to an action on [the released] claim," including when the release was allegedly procured by fraud, so long as the release "is not rescinded or avoided by a return or offer to return the money or other valuable consideration given for it." Id. at 80. This conclusion was based on the commonsense recognition that a

-15-

plaintiff "cannot affirm the release as valid and operative so far as it is for his benefit, and disaffirm that part which is beneficial to the releasee."  Id.  While Pelletier's holding recognizes that an "offer to return" consideration is generally part of seeking rescission, it does not establish an ironclad rule.

Here, PHL at no time attempted to "affirm [the Policy] as valid," id., and in fact, in its complaint, PHL stated that it stood "ready, willing, and able to refund or otherwise make payment of all or any portion of the premiums paid for the Policy as directed by the Court."  PHL "fully and unconditionally tender[ed] the Policy's premiums to the Court's registry."  Thus, to the extent that Pelletier endorses a "tender back" requirement, PHL undoubtedly fulfilled it.

The Trust's implication that PHL, during the pendency of its lawsuit for rescission, had to hand over the premiums to the Trust (the party that PHL alleged had conspired to defraud it in the first place), rather than to the court, is not supported by any cited authority.  In fact, at least one Rhode Island case suggests the opposite. Cf. Cruickshank v. Griswold, 104 A.2d 551, 552 (R.I. 1954) ("[A] bill in equity to obtain a rescission is not like an action at law brought on the footing of a rescission previously completed; rather, the foundation of the bill is that the rescission is not complete and that the plaintiff asks the aid of the court to make it so.").

-16-

Moreover, the Trust's argument that the "tender back" requirement flatly prohibited the court from using the Policy premium to offset PHL's consequential damages runs contrary to other settled rules of Rhode Island law. The Rhode Island courts have held that a trial court sitting in equity has "discretion to determine the appropriateness of, and to formulate, equitable relief," and that this discretion "should be guided by 'basic principles of equity and justice.'" Ruggieri v. City of E. Providence, 593 A.2d 55, 57 (R.I. 1991) (quoting City of E. Providence v. R.I. Hosp. Trust Nat'l Bank, 505 A.2d 1143, 1146 (R.I. 1986)).

One of these basic principles is that contract rescission "seeks to create a situation the same as if no contract ever had existed," Dooley v. Stillson, 128 A. 217, 218 (R.I. 1925), an endeavor that may include allowing a party to recover costs it would not have incurred but for the formation of the contract, see Lummus Co. v. Commw. Oil Ref. Co., 280 F.2d 915, 927 (1st Cir. 1960) (describing "[t]he purpose of an action for rescission" as "to permit the defrauded party to obtain restitution of the benefits conferred by him," including "such special damages as are necessary to make [the defrauded party] whole"); Tarpinian v. Daily, No. 95-0104, 1997 WL 838150, at *3-4 (R.I. Super. Ct. Aug. 15, 1997). Another such principle is that parties should not gain advantage from their own fraud. See Silva v. Merritt Chapman &

Scott Corp., 156 A. 512, 514 (R.I. 1931).  And yet another is that "a court of equity, when its jurisdiction has been invoked for any equitable purpose, will proceed to determine any other equities existing between the parties which are connected with the main subject of the suit [and] grant all relief necessary to an entire adjustment of the litigated matters, provided they are authorized by the pleadings."  Sparne v. Altshuler, 90 A.2d 919, 923 (R.I. 1952).

Taken together, these equitable principles provide ample support for the district court's decision to make PHL whole by allowing it to retain the premium.  PHL paid a commission to Rainone of $172,365 that it would not have paid but for the misrepresentations that led it to issue the Policy.[10]  Mere rescission of the contract would not have compensated PHL for this expense.  While PHL apparently did not provide a precise accounting of the other costs it incurred with respect to the Policy, see PHL Variable, 889 F. Supp. 2d at 277 n.1, it was reasonable for the district court to conclude that the costs alleged in PHL's complaint -- including underwriting, administration, and servicing of the Policy, as well as investigation into the misrepresentations

---

[10] The Trust's argument that PHL could not recover this amount as damages against the Trust is discussed below.

in the application -- justified awarding PHL the remaining $19,635 from the premium, particularly in light of the Trust's fraud.[11]

The district court, following Rhode Island law, was warranted in refusing to reward the Trust for its "unclean hands." See, e.g., Cullen v. Tarini, 15 A.3d 968, 975, 979 (R.I. 2011) (affirming lower court's finding that, in equitable suit regarding real property, defendants had come to court with unclean hands and this could have been a basis for rejecting their affirmative defenses). The court could reasonably view the record as demonstrating that the Trust did not pay the premium from its own funds; indeed, it had no funds. The payment was funded by the loan from Imperial meant to perpetrate the fraud. If PHL were ordered to refund all or part of the premium to the Trust, the Trust would be enriched with money that it never had in the first place. That is, the Trust would not be placed back in its pre-contract position, but in a better position, while PHL would be worse off than it would have been had the contract never existed. Or, whether or not the Trust would be put in a better position,[12] as

_____

[11] The district court denied PHL's motion for attorneys' fees, PHL Variable, 889 F. Supp. 2d at 284, and as such we interpret the court's award of special damages to include expenses incurred by PHL other than amounts paid to its attorneys in this action.

[12] It is worth noting that, under the terms of the Amended and Restated Trust Agreement, the Trust would be obligated to turn over any premium refund to Imperial. If it did so, the refund would result in an inequitable windfall to Imperial rather than to the Trust itself. Imperial has already received a kickback of $67,025 from Rainone's commission, and the entire refunded premium would be

between the Trust and PHL it was entirely equitable to impose the costs of the fraud on the former. See Randall v. Loftsgaarden, 478 U.S. 647, 663 (1986) ("[I]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." (quoting Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965)) (internal quotation marks omitted)). The flexibility of equity is designed to avoid unjust results.

Next, the Trust argues that the district court's decision violated Rhode Island's election of remedies rule. Under Rhode Island law, a party who asserts that a contract was procured by fraud can choose either to seek rescission of the contract or to affirm the contract and sue for damages. See LaFazia, 575 A.2d at 184. The Trust asserts that the district court's order, which both granted rescission and awarded damages, ran afoul of this rule. In its view, once PHL obtained rescission, it was barred from seeking any damages.

Again, the Trust misstates the law. The election of remedies rule simply does not apply in this case. PHL did not seek damages on the Policy: that is, it did not affirm the contract and then file an action on that contract, seeking contractually based damages. Instead, PHL elected its equitable remedy of rescission,

_____

more than the original principal amount of its loan to the Trust ($189,000). Imperial would thus realize a profit of up to $70,025 on the fraudulent transaction, while PHL would be worse off than it began.

-20-

and, consistent with the purposes of rescission, sought only such damages as would return it to the position it would have been in had it never entered the contract. Cf. FUD's, Inc. v. State, 727 A.2d 692, 696-97 (R.I. 1999) (citing Justice Story for the proposition that money damages are available in cases at equity when they are "incidental" to the equitable relief sought (quoting 2 Commentaries on Equity Jurisprudence § 794, at 1-2 & n.1 (12th ed. 1877))); R.I. Dairy Queen, Inc. v. Burke, 187 A.2d 521, 526 (R.I. 1963) (same). The damages that the district court awarded in this case were for expenses incidental to the rescinded contract, and reimbursement for those expenses was necessary to craft an equitable remedy that would make PHL whole.

Finally, the Trust argues that the district court's decision was contrary to Rhode Island law holding that a party who has an adequate remedy at law cannot seek relief in equity. See Kocon v. Cordeiro, 200 A.2d 708, 710 (R.I. 1964). The Trust alleges that PHL had an adequate remedy at law because it could have sued Rainone to recover the commission it paid him. However, Rhode Island law also provides that, in order to defeat equity jurisdiction, the remedy at law must be "as certain, prompt, complete and efficient as can be granted by a chancellor." Id. The evidence does not support a conclusion that any alleged remedy at law would meet this standard.

First, PHL was clearly entitled to invoke the court's equity jurisdiction by seeking rescission of the Policy: no award of damages against any party involved in procuring the Policy would have adequately compensated PHL for the prospect of having to pay a death benefit of $5 million. Once PHL was properly before the court on its claim for rescission, the court had authority to "proceed to determine any other equities existing between the parties which are connected with the main subject of the suit," Sparne, 90 A.2d at 923 -- including the special damages associated with the Trust's role in the fraud.

Further, the Trust has not put forth any evidence to show that PHL's supposed remedy at law against Rainone is at all "certain" or "complete." PHL has alleged that Rainone is judgment-proof, and the Trust has not argued to the contrary. See Thew Shovel Co. v. McCormick, 166 A. 354, 355 (R.I. 1933) (holding that claim against insolvent estate would be "neither a complete nor an adequate remedy" at law). Additionally, if the Trust believed that Rainone – or Bowie, or Vianello, or Imperial -- was the party liable to PHL for the company's losses, the Trust could have impleaded any one or more of those parties in this action.

B.      Fraud

The Trust first argues that the issue of fraud was entirely irrelevant once the Trust agreed to rescission, since, on the Trust's view, return of the premium should have been automatic

-22-

upon rescission regardless of other circumstances. Given our determination that the Trust misconstrues Rhode Island rescission law, we likewise reject this argument.

The Trust then argues that the uncontested record evidence was insufficient to find that the Trust engaged in fraudulent conduct. The Trust's argument fails. We need not find, as the district court did, that the Trust's conduct met the elements of common law fraud, see PHL Variable, 889 F. Supp. 2d at 281-83, since PHL did not plead a claim of fraud. Rather, we conclude that the uncontested evidence showed that there was a conspiracy, of which the Trust was an integral part, to deceive PHL into issuing a policy based on false pretenses, and that this evidence of the Trust's unclean hands justified the equitable award of special damages to PHL.

The Trust asserts that the only representation Baldi made to PHL on behalf of the Trust was that the statements in the April 28 application were those of the proposed insured and that the statements were true to Baldi's "best knowledge and belief." Since Baldi did not know when he signed the application that the statements were false, the Trust argues, he could not have made a fraudulent misrepresentation.

This argument is disingenuous at best. First, as he admitted at his deposition, Baldi had never met or spoken to Peter Bowie at the time he signed the application, and Baldi did not see

Bowie sign the application. He thus had no basis for believing that the statements made in the application were in fact those of the proposed insured, as he attested with his signature. Baldi also admitted that he made no inquiries as to the source or truth of the representations in the application, so he could not have had any "knowledge or belief" as to whether or not those representations were "full, complete, and true." See Transitron Elec. Corp. v. Hughes Aircraft Co., 649 F.2d 871, 875 n.6 (1st Cir. 1981) (noting that "[o]rdinary fraud embraces a material misrepresentation in which the maker has no basis for belief, as well as that which he knows to be false" (emphasis added)). Finally, no later than May 26, 2008, when he signed the loan agreement with Imperial, Baldi knew that Bowie was not the one paying the Policy premiums, as both the application and the Statement of Client Intent had attested. Yet Baldi made no attempt to correct this known misrepresentation. Instead, he participated in the scheme to have Imperial secretly take an interest in the Policy, while keeping himself as uninformed as possible about the transactions.

The Trust also argues that PHL relied only on the earlier February 28 application, not signed by the Trust, in conducting its underwriting, and thus that any representations made by the Trust were irrelevant to PHL's damages. While it is true that PHL began its underwriting on the earlier application, the April 28

-24-

application repeated all of the same statements on which PHL had based its underwriting -- including Bowie's career, income, and net worth. By signing that application on behalf of the Trust, Baldi averred that all of that information was true to the best of his knowledge. The Policy Acceptance Form, which Bowie also signed on behalf of the Trust, specifically recognizes the April 28 application as the operative one for the Policy: the form states that "[t]here is no coverage under application #OL4250.1 dated 02/29/2008." Further, in addition to the April 28 application, Baldi signed the Statement of Client Intent and the Policy Acceptance Form; the former document included additional assurances that Bowie would pay the premiums, and the latter confirmed that the representations in the application continued to be true.

The Trust's argument attempts to avoid the conclusion, inescapable from the record evidence, that Baldi, Bowie, Rainone, and Imperial were part of a common fraudulent scheme that sought to obtain for Imperial a life insurance contract that Imperial could not have purchased on its own. The misrepresentations by all of these parties, working in concert, led PHL to issue a policy on false pretenses and to incur costs associated with that policy.

Given these findings, there was no error in the district court's weighing of equities that led it to conclude that PHL was entitled to retain the Policy premium as special damages. See PHL Variable, 889 F. Supp. 2d at 282-83.

IV.

The district court's grant of summary judgment in favor of PHL, including its order allowing PHL to retain the Policy premium, is <u>affirmed</u>.