# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 23, 2015

Lyle W. Cayce
Clerk

No. 14-11020

ONIE JANE PENA, Individually and as representative of the estate of
George Cornell, Deceased,

      Plaintiff–Appellee,

v.

RONALD GIVENS; ALEXANDER ACHEBE; SHERWIN DE GUZMAN;
RONNIE JOE ANDERSON; KEVIN T. BROWN, M.D.; NANCY
SCHIERDING; VERNELL BROWN,

      Defendants–Appellants.

Appeals from the United States District Court
for the Northern District of Texas
USDC 3:12-CV-439

Before REAVLEY, PRADO, and COSTA, Circuit Judges.

PER CURIAM:*

    This case arises from George Cornell's tragic death at a state-run
psychiatric emergency room. His representative sued the doctors, nurses, and
technicians who treated him and the hospital supervisors for violations of his
Fourth and Fourteenth Amendment rights. The district court denied the

---

    * Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 14-11020

defendants' motions for summary judgment on the grounds of qualified immunity. The defendants bring this interlocutory appeal asserting that they are entitled to such immunity. We reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In February 2011, Cornell arrived at a fire station and complained that he was being chased. A fireman called the police, who, upon arrival, handcuffed Cornell and took him to the Parkland psychiatric emergency room (the "Psych ER"). Cornell was considered "APOWW, *i.e.*, apprehended by a police officer without a warrant."[1]  Parkland is a state hospital.

### A.    Treatment at Parkland

Defendants–Appellants Dr. Kevin Brown and Nurse Sherwin De Guzman were present at Cornell's intake, during which Dr. Shawn Chambers took Cornell's medical history. Cornell told Chambers that he had "tachycardia." Cornell stated that "people had stolen his lottery ticket and were chasing him." Cornell was admitted to the Psych ER pursuant to Dr. Brown's authorization.

Johnny Roberts, a technician in the Psych ER (a "psych tech"), took Cornell's vital signs, which registered as abnormally high. Cornell's pulse was 124 beats per minute, his blood pressure was 142/105 mm Hg, and his respirations were 17 breaths per minute. Because Cornell's pulse and blood pressure readings were elevated, Roberts tried to take his vital signs again,

---

[1] Texas law allows a police officer to take a person into custody without a warrant if "the officer . . . has reason to believe that (A) the person is a person with mental illness; and (B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained." Tex. Health & Safety Code § 573.001(a). The officer must "immediately transport" that person to the nearest appropriate mental-health facility. *Id.* § 573.001(d). The mental-health facility may detain that person "in custody for not longer than 48 hours after the time the person is presented to the facility unless a written order for protective custody is obtained." *Id.* § 573.021(b). Appellees do not challenge the officers' grounds for bringing Cornell to Parkland.

but the machine malfunctioned. Though Cornell had been cooperative up to this point, he became agitated and refused to cooperate when Roberts attempted to take his vital signs a third time. Parkland staff provided no further cardiac treatment to Cornell.

Roberts asked Defendant–Appellant Robert Givens, another psych tech, for assistance calming Cornell, but Cornell continued to resist and tried to leave the Psych ER. Roberts informed Dr. Brown of Cornell's behavior. Givens put Cornell in either a "basket hold" or "elbow-to-hip containment," and pushed him into a seclusion room. The techs held Cornell on a mat on the floor. The techs' testimony conflicts as to whether Cornell was held on his side or his stomach.

De Guzman arrived and injected Cornell with a mixture of Haldol, Ativan, and Benadryl to subdue him. Haldol and Benadryl can cause cardiac arrhythmia and death. The techs continued to hold Cornell down, though testimony varies as to how long the hold lasted: Givens stated it lasted "a minute or two," Roberts said "several minutes," and De Guzman said "maybe five minutes."

After Givens and Roberts left the room, Cornell became agitated again. He began yelling, and he ripped up a vinyl tile from the floor and banged it against the door. A third psych tech, Defendant–Appellant Alexander Achebe, convinced Cornell to trade the tile for a juice box. The techs began to move Cornell to a new room because he had ripped up the flooring. As they approached the second seclusion room, Cornell crushed the juice box and began physically resisting the techs. They again restrained Cornell and put him on a mat in the room. Cornell received a second injection of the same medications.

Again, there is conflicting testimony about how Cornell was held on the mat. Accepting Pena's version of the facts, Cornell was held on his stomach for fifteen minutes after the injection. Psych techs were trained not to hold a

patient in a prone position for more than a minute, because longer holds can cause asphyxiation. The techs then left the room.

A nurse later found Cornell lying in a prone position in the room with his right arm beneath him and his hand pointed to the ceiling. His hand was cyanotic, and the nurse could not detect spontaneous respirations. The nurse called a code blue, and Cornell was transferred to the main emergency room, where he died. The medical examiner found abrasions on the left side of Cornell's forehead. After an investigation into Cornell's death, the medical examiner found the cause of death to be undetermined, listing three potential causes: 1) mechanical compression; 2) underlying cardiac issues; or 3) effects of the medication he received in the Psych ER.

## B.     Supervision at Parkland

At the time of Cornell's death, Defendant–Appellant Nancy Schierding was Parkland's Director of Nursing for Psychiatric Services. Defendant–Appellant Nurse Vernell Brown was Unit Manager III for the Psych ER and was responsible for the Psych ER staff, including nurses and techs. At her deposition, Schierding recalled other complaints of improper treatment in the Psych ER. A Centers for Medicare and Medicaid Services (CMS) Report prepared after Cornell's death noted that De Guzman's restraint-and-seclusion training had lapsed at the time of the incident, as Nurse Brown and Schierding should have been aware. At the time, Defendant–Appellant Dr. Ronnie Anderson was the CEO of Parkland.

In 2008, prior to Cornell's death, CMS sent a letter to Anderson stating that Parkland "fail[ed] to provide appropriate medical screening examination to determine whether an emergency medical condition existed" and that the "deficiencies [we]re so serious that they constitute an immediate threat to the health and safety of any individual that comes to [Parkland] with an emergency medical condition." The CMS Report generated after Cornell's

death detailed ongoing problems, noting that, due to an unusually high number of complaints, injuries, and deaths, Parkland had been "under near constant surveillance and investigation" by the Texas Department of State Health Services and CMS.

## C.     **Procedural History**

Plaintiff–Appellee Onie Pena, as the representative of Cornell's estate, filed a complaint in Texas district court against Parkland and the Defendants–Appellants, among others. Parkland removed the case to federal court. Relevant to this appeal, Pena alleges that Givens and Achebe used excessive force against Cornell in violation of the Fourth Amendment or, in the alternative, in violation of Cornell's substantive due process rights. Pena alleges that De Guzman and Dr. Brown violated Cornell's right to due process by denying him medical care for his heart condition. Finally, Pena avers that Schierding, Anderson, and Nurse Brown (collectively, "the Supervisory Defendants") contributed to these constitutional violations by inadequately supervising the Psych ER.

The Appellants moved for summary judgment, arguing that they are entitled to qualified immunity. The district court denied their motions, and Appellants filed timely notices of interlocutory appeal.

## II. JURISDICTION

This Court has jurisdiction over the denial of a motion for summary judgment based on qualified immunity, but this jurisdiction is severely limited, "for it extends to such appeals only to the extent that the denial of summary judgment turns on an issue of law." *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc) (alteration and internal quotation marks omitted). Thus, this Court "can review the materiality of any factual disputes, but not their genuineness." *Juarez v. Aguilar*, 666 F.3d 325, 331 (5th Cir. 2011) (quoting *Kinney*, 367 F.3d at 347).

No. 14-11020

## III. DISCUSSION

### A.     Legal Standard

This Court "review[s] the district court's denial of qualified immunity de novo, accepting all well-pleaded facts as true and viewing them in the light most favorable to the plaintiff." *Cantrell v. City of Murphy*, 666 F.3d 911, 918 (5th Cir. 2012) (quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)). Because we "lack the authority to review the district court's decision that a genuine factual dispute exists, we do not apply the ordinary summary judgment standard." *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013). Instead, we consider "only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney*, 367 F.3d at 348. The burden to establish the inapplicability of qualified immunity is on Pena. *See Cantrell*, 666 F.3d at 918.

We apply "a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity." *Id.* at 922. First, "we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." *Id.* (quoting *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007)). Second, we ask "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* (quoting *Freeman*, 483 F.3d at 411). We may exercise our discretion in deciding which of the two prongs to address first. *Id.*

For a right to be clearly established under the second prong of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Kinney*, 367 F.3d at 349–50 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This requirement establishes a high bar." *Wyatt v. Fletcher*, 718 F.3d

6

496, 503 (5th Cir. 2013). To hold that law is clearly established, we must "be able to point to 'controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity.'" *Id.* (quoting *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc)); *cf. City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015) ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."). However, a plaintiff need not show that "the very action in question has been previously held unlawful." *Cantrell*, 666 F.3d at 919 (quoting *Wernecke v. Garcia*, 591 F.3d 386, 393 (5th Cir. 2009)). Rather, "the unlawfulness need only be readily apparent from relevant precedent in sufficiently similar situations." *Id.* (quoting *Brown*, 519 F.3d at 236–37).

## B.   Givens and Achebe (Excessive Force and Substantive Due Process)

Pena claims that Givens and Achebe (collectively "the psych techs") used excessive force against Cornell in violation of the Fourth Amendment. Pena also maintains that the psych techs violated Cornell's substantive due process rights under the Fourteenth Amendment. The district court denied qualified immunity on the Fourth Amendment claim but did not discuss the Fourteenth Amendment claim. We address each claim in turn.

### *1. Fourth Amendment Excessive Force*

To establish a Fourth Amendment excessive-force claim, "a plaintiff must first show that she was seized. Next she must show that she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and (3) the force used was objectively unreasonable." *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (citation omitted).

The district court held that Cornell's Fourth Amendment rights were clearly established based, explaining that "several courts have found that

No. 14-11020

[police officers] restraining a suspect or patient in a prone position can constitute excessive force" and that "the technicians were trained not to use this kind of hold for extended periods of time." The district court found that the psych techs' "restraint of Cornell was not intended to treat his condition but rather to subdue him and prevent him from leaving the hospital." Quoting the Sixth Circuit's decision in *McKenna v. Edgell*, 617 F.3d 432, 438–39 (6th Cir. 2010), the district court reasoned: "[E]xposure to liability does not depend merely on the profession of the government actors."

Yet, as noted, before a court can consider whether the forced used was excessive, "a plaintiff must first show that she was seized." *Flores*, 381 F.3d at 396. Qualified immunity thus attaches unless the law is clearly established that the defendant's conduct amounted to a seizure. *See id.* at 400 (determining, before looking to the amount of force used, that "[i]t was clearly established that stopping a moving car by intentionally shooting it constitutes a seizure"). Givens and Achebe contend that "it was not clearly established law that medical personnel who restrain patients while rendering aid have 'seized' the patient for Fourth Amendment purposes."

This Court has held implicitly that a person taken into custody by police officers under Texas Health and Safety Code § 573.001 is seized under the Fourth Amendment. *See Cantrell*, 666 F.3d at 923 (holding that Texas police officers who had probable cause to believe the plaintiff that they detained was a danger to herself were qualifiedly immune). We are, however, unaware of a case extending Fourth Amendment seizure law to mental-health facilities and workers that take custody of these individuals pursuant to Texas Health and Safety Code § 573.021, which authorizes a mental-health facility to temporarily hold parties brought into custody pursuant to § 573.001.

Moreover, in *Peete v. Metropolitan Government of Nashville & Davidson County*, the Sixth Circuit "f[ound] no case authority holding that paramedics

answering a 911 emergency request for help engage in a Fourth Amendment 'seizure' of the person when restraining the person to render aid." 486 F.3d 217, 219 (6th Cir. 2007). In that case, paramedics were called to render aid to an epileptic man experiencing a seizure. *Id.* at 219–20. The paramedics restrained the man by "using their bodies to apply weight and pressure to [the epileptic's] head, neck, shoulders, arms, torso, and legs in an attempt to prevent the decedent from moving"; they "tied his hands and ankles behind his back and continued to apply pressure to [him] while he was in a prone position." *Id.* at 220.

In its opinion, the Sixth Circuit distinguished *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004), a case on which the district court here heavily relied. *See Peete*, 486 F.3d at 221–222. *Champion* involved a § 1983 Fourth Amendment excessive-force claim brought against several police officers. 380 F.3d at 895–96. That case turned on a custodial arrest by the police of a severely autistic man who had become violent with his caretaker. *Id.* In that case, the plaintiff, Champion, struggled with the officers during the course of the arrest. *Id.* at 896–97. Looking at the facts in the light most favorable to the plaintiff, the court found that the officers remained on top of Champion even after he stopped resisting "and sprayed him with pepper spray even after he was immobilized by handcuffs and a hobbling device." *Id.* at 901. Champion, who began vomiting after several minutes of being held down, was dead upon arrival at the hospital. *Id.* at 898. The court held that Champion's arrest amounted to a clearly established unreasonable seizure under the Fourth Amendment. *Id.* at 901–902.

Importantly, in *Peete*, the Sixth Circuit found that *Champion* did not apply to the paramedics' conduct because the paramedics "were not acting to enforce the law, deter, or incarcerate." 486 F.3d at 222. As the court explained,

No. 14-11020

the paramedics "were unlike the police officers in *Champion* who handcuffed and shackled the plaintiff in order to arrest and incapacitate him." *Id.*

The Sixth Circuit addressed the applicability of *Peete* to police officers rendering medical aid in *McKenna v. Edgell*, 617 F.3d 432 (6th Cir. 2010). Officers were the first responders to a 911 call requesting assistance for a man having a seizure; the officers handcuffed the man, though the reasons for the restraint were disputed. *Id.* at 435–36. The officers argued that they were entitled to qualified immunity based on *Peete*; the plaintiff countered that *Peete* was inapplicable because *Peete* concerned paramedics. *Id.* at 438–39. The Sixth Circuit held that whether the Fourth Amendment applied hinged on "whether the [officials] acted in a law-enforcement capacity or in an emergency-medical-response capacity." *Id.* at 439–40.

We hold it was not clearly established that psych techs conduct in this case amounted to a seizure under the Fourth Amendment. Although whether the Fourth Amendment applies does not turn *solely* on whether the government officials were police officers, *see McKenna*, 617 F.3d at 438–39, the Sixth Circuit has held that whether *Peete* applies should depend on "whether the [officials] acted in a law-enforcement capacity or in an emergency-medical-response capacity," *id.* at 439. Pena cites no binding authority holding that a medical professional's restraint of an individual in an emergency medical situation constitutes a Fourth Amendment seizure. *Champion*, relied upon by both the district court and Pena, involved police officers' use of force after they had already seized an individual. Under *McKenna*, even *police officers'* use of restraint does not implicate the Fourth Amendment if they are acting in an "emergency-medical-response capacity," *id.* at 439–40.

Pena points to no "controlling authority—or a robust consensus of persuasive authority," *Wyatt*, 718 F.3d at 503 (quoting *Morgan*, 659 F.3d at 371–72), suggesting that medical personnel "seize" patients when restraining

them in the course of providing treatment.[2] Therefore, we hold that Pena has not carried her burden, *see Cantrell*, 666 F.3d at 918, and that Givens and Achebe are entitled to qualified immunity on the excessive-force claims.

### 2. Substantive Due Process

The district court did not discuss Pena's Fourteenth Amendment substantive due process claim in its order denying qualified immunity.[3] Because Givens and Achebe argued that they were entitled to qualified immunity on this issue in their motion for summary judgment, we read the district court's order as a denial without explanation. Where the district court denies summary judgment on qualified immunity without explanation, this Court "review[s] the record to determine what conduct the district court attributed to [the defendant] in finding that he had violated clearly established law." *Petta v. Rivera*, 143 F.3d 895, 899 (5th Cir. 1998) (per curiam).

"This circuit held as early as 1981 that '[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process.'" *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450–51 (5th Cir. 1994) (en banc) (quoting *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981)).[4]

---

[2] The district court found that the psych techs' "restraint of Cornell was not intended to treat his condition but rather to subdue him and prevent him from leaving the hospital." As Givens and Achebe point out, "the only way to ensure Cornell received treatment was if he stayed in the hospital." Therefore, although we must accept the court's finding that the psych techs held Cornell down to keep him from leaving the hospital, in the context of psychiatric care, that restraint is for treatment purposes.

[3] This could have been intentional: the district court denied qualified immunity on the Fourth Amendment claim, and a substantive due process claim is unavailable if an excessive-force claim is "'covered by' the Fourth Amendment." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). If, however, Cornell was not "seized" for Fourth Amendment purposes, then Pena may raise a substantive due process claim. *See id.* at 843–44.

[4] Givens and Achebe concede that "it was clearly established as of the date of the incident that state officials could not engage in conscience-shocking behavior." We thus focus on whether the behavior of Givens and Achebe shocks the conscience.

No. 14-11020

"[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. "[T]he constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848. The officials' actions must be "grossly disproportionate to the need for action under the circumstances and . . . inspired by malice rather than merely careless or unwise excess of zeal." *Petta*, 143 F.3d at 902.

Pena argues that "the use of life-threatening and prohibited restraints by Givens and Achebe on Cornell was 'grossly disproportionate to the need for action under the circumstances.'" Pena insists that a reasonable factfinder could infer that Givens and Achebe were inspired by malice because this type of restraint violated their training. Pena supports her argument with the Sixth Circuit's unpublished decision in *Davis v. Pickell*, 562 F. App'x 387 (6th Cir. 2014).

In *Davis*, the Sixth Circuit affirmed a district court's denial of officers' motions for summary judgment on qualified immunity. *Id.* at 387. An arrestee was removed from a holding cell, "taken to a safety cell with his hands behind his back, . . . sprayed with mace[,] and slammed to the ground in the hallway." *Id.* at 389. Assuming that the arrestee "was neither threatening nor resisting the officers," the court held that "the force they used . . . shocks the conscience." *Id.* at 392.

As Givens and Achebe point out, Cornell concededly resisted Parkland staff. Indeed, all of the cases cited by Pena, in both the Fourth and Fourteenth Amendment contexts, involve the use of force on non-resistant subjects. Moreover, Pena gives too much weight to the fact that Givens and Achebe

12

violated their training by holding Cornell in a prone position for an extended period of time. The Supreme Court has stated that, even in the context of a Fourth Amendment excessive-force claim, "if an officer acts contrary to her training, . . . that does not itself negate qualified immunity where it would otherwise be warranted." *Sheehan*, 135 S. Ct. at 1777. Though Givens and Achebe's behavior is concerning, no reasonable jury could conclude that it was "grossly disproportionate to the need for action under the circumstances and [was] inspired by malice rather than merely careless or unwise excess of zeal." *Petta*, 143 F.3d at 902; *see also Lewis*, 523 U.S. at 848. Thus, we hold that Givens and Achebe are entitled to qualified immunity on both the Fourth and Fourteenth Amendment claims.

## C.    De Guzman and Dr. Brown (Denial of Medical Care)

De Guzman and Dr. Brown appeal the district court's denial of their motion for summary judgment on qualified immunity regarding Pena's claim that they violated Cornell's due process rights under the Fourteenth Amendment by denying him adequate medical care for his heart condition.

The Supreme Court has recognized "that the Due Process Clauses generally confer no affirmative right to governmental aid." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). "The Court [has], however, recognize[d] an exception where in 'certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals.'" *Cantrell*, 666 F.3d at 920 (quoting *DeShaney*, 489 U.S. at 198). "[A] state may create a 'special relationship' with a particular citizen, requiring the state to protect him from harm, 'when the State takes a person into its custody and holds him there against his will.'" *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 856 (5th Cir. 2012) (en banc) (quoting *DeShaney*, 489 U.S. at 199–200).

No. 14-11020

The Supreme Court has recognized a special relationship for incarcerated and involuntarily committed individuals, and the Fifth Circuit has "extended the special relationship exception to the placement of children in foster care." *Covington Cty.*, 675 F.3d at 856 (citing *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990)). The rationale behind the special-relationship exception is that:

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney*, 489 U.S. at 200. This Court "has followed [*DeShaney*'s] language strictly and ha[s] held consistently that only when the state, by its affirmative exercise of power, has custody over an individual *involuntarily or against his will* does a 'special relationship' exist between the individual and the state." *Walton v. Alexander*, 44 F.3d 1297, 1303 (5th Cir. 1995) (en banc) (emphasis in original).

Though the proper standard to apply to the denial of medical care to mental patients is unclear,[5] "courts applying . . . the 'special relationship'

---

[5] In *Youngberg v. Romeo*, decided before *DeShaney*, the Court concluded that "liability may be imposed only when the decision by the [mental-health] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person actually did not base the decision on such a judgment." 457 U.S. 307, 323 (1982). This standard "flowed from the premise that '[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 647 (5th Cir. 1996) (en banc) (quoting *Youngberg*, 457 U.S. at 321–22). But in *DeShaney*, the Court "called into question the constitutional significance of this premise." *Id.* In *DeShaney*, the Court "did not address whether involuntarily confined mental incompetents and convicted inmates shared the same constitutional rights to medical care and safety." *Id.* This Court observed that:

> [s]ince *DeShaney* suggested that both groups enjoyed the same rights, however, either the *Youngberg* standard or the deliberate indifference

14

exception to the *DeShaney* rule . . . have generally required plaintiffs to demonstrate . . . that the defendant state official *at a minimum* acted with deliberate indifference toward the plaintiff." *McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002) (en banc) (per curiam) (emphasis in original).

"To act with deliberate indifference, a state actor must 'know [ ] of and disregard[ ] an excessive risk to [the victim's] health or safety." *Id.* at 326 n.8 (alterations in original) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002)); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "[A]ctual knowledge is critical to the inquiry. A state actor's failure to alleviate 'a significant risk that he should have perceived but did not[]' . . . does not rise to the level of deliberate indifference." *McClendon*, 305 F.3d at 326 n.8 (quoting *Farmer*, 511 U.S. at 837). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

The district court found a fact issue as to whether De Guzman and Dr. Brown "knew that Cornell suffered from a heart condition but nevertheless failed to provide adequate medical care" in violation of Cornell's Fourteenth Amendment right to medical care. Assuming without deciding that clearly established law creates a special relationship between the state and mentally

---

standard must give way to achieve the requisite equivalence in constitutional rights. The Court thus has cast doubt on the vitality of *Youngberg* by confirming that a deliberate indifference standard is the appropriate measure of constitutional liability for a prison official's failure to provide a convicted inmate with basic human needs.

*Id.* Ultimately, this Court in *Hare* declined to answer the question with regard to involuntarily committed individuals, but it adopted a deliberate indifference standard for pretrial detainees. *Id.*

ill individuals held involuntarily prior to formal commitment proceedings, we hold that Pena has not raised a genuine dispute of material fact as to whether De Guzman and Dr. Brown violated Cornell's constitutional rights.

In *Domino v. Texas Department of Criminal Justice*, this Court reversed the denial of summary judgment on qualified immunity grounds to a prison psychologist after an inmate committed suicide. 239 F.3d 752, 756 (5th Cir. 2001). The inmate, who had a history of psychiatric issues, visited the defendant–psychiatrist two hours prior to hanging himself. *Id.* at 753. The inmate "asked for sleeping pills," which he was denied, "and expressed apprehension about his upcoming transfer from administrative segregation to the general prison population." *Id.* The inmate then stated "I can be suicidal" and banged his head on the table so loudly that the guards outside the office could hear. *Id.* at 753, 755. The psychiatrist had the inmate returned to his cell after their five-minute meeting, and the inmate committed suicide two-and-a-half hours later. *Id.* at 753.

This Court reversed the district court's denial of summary judgment because the record "would not permit a reasonable jury to conclude that [the psychiatrist] knew that Domino was a serious suicide risk." *Id.* at 756. We noted that "suicide is inherently difficult for anyone to predict," and that "[d]eliberate indifference is an extremely high standard to meet." *Id.* Moreover, the psychiatrist "produced evidence that [the inmate] had been a difficult, often uncooperative patient and concluded that [the inmate] was threatening suicide to obtain secondary gain." *Id.*

*Domino* establishes a high bar for deliberate indifference in this context, and the facts in this case do not reach that bar. Accepting the facts that the district court found to support the denial of qualified immunity as we must—that Dr. Brown and De Guzman knew of Cornell's heart condition and did not provide further care—the undisputed facts show that Cornell resisted the

16

officers when they tried to provide care. We cannot say that a reasonable jury could conclude that the failure to treat a heart condition after a patient refuses care and begins attacking staff amounts to deliberate indifference. Thus, we reverse the district court's denial of qualified immunity to De Guzman and Dr. Brown.

**D.    Anderson, Nurse Brown, and Schierding (Supervisory Liability)**

Anderson, Nurse Brown, and Schierding (the "Supervisory Appellants") appeal the district court's denial of qualified immunity on Pena's § 1983 supervisory-liability claim. This Court has held supervisors "liable for constitutional violations committed by subordinate employees when supervisors act, or fail to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Aterberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 255 (5th Cir. 2005) (emphasis in original). The Supervisory Appellants argue the Supreme Court's opinion in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) put the continued viability of § 1983 supervisory liability in question, and, therefore, they could not have violated clearly established law.

The district court separately considered whether supervisory liability remains clearly established after *Iqbal*. In light of its conclusions that the law clearly established the constitutional rights allegedly violated by the various subordinates, the district court's decision to address the impact of *Iqbal* on § 1983 supervisory liability was sound. But we have answered these underlying constitutional questions differently than the district court. As a

result, we need not pronounce the fate of § 1983 supervisory liability post-*Iqbal*.[6]

Supervisory liability requires a constitutional violation by a subordinate. *See Aterberry*, 430 F.3d at 255. As explained above, the evidence in this case would not support a jury finding that Dr. Brown and De Guzman violated Cornell's due process rights by denying him adequate medical treatment for his heart condition. With no underlying violation for denial of medical care, the Supervisory Defendants cannot be liable under § 1983 for any supervisory deficiencies regarding the medical care provided to Parkland's mental patients. This is equally true in the context of the underlying substantive due process claim against the psych techs.

We resolved the psych techs' qualified immunity challenge based on a different part of the qualified immunity standard: the lack of clarity on whether physical restraint in the context of mental-health treatment is a seizure. Of course, this does not answer whether a constitutional violation did or did not occur. It simply answers whether the psych techs can be made to account for it. But the unsettled nature of the law in this area likewise entitles the Supervisory Appellants to qualified immunity. In *Doe v. Taylor Independent School District*, we explained that supervisors are entitled to qualified immunity unless *both* the underlying constitutional right and the supervisors' duty with respect to that right were clearly established. 15 F.3d at 454; *see also Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002) ("We conclude that [plaintiff] must show that both laws were clearly established to lay the

---

[6] Although the particular facts of this case do not require us to address the Supervisory Appellants' *Iqbal* argument, we note the many cases in the years since *Iqbal* in which we have continued to apply our rigorous pre-*Iqbal* standards for supervisory liability. *See, e.g., Brauner v. Coody*, 793 F.3d 493, 500–01 (5th Cir. 2015); *Pierce v. Hearne Indep. Sch. Dist.*, 600 Fed. App'x 194, 199 (5th Cir. 2015); *Whitley v. Hanna*, 726 F.3d 631, 639–41 (5th Cir. 2014); *Walker v. Upshaw*, 515 F. App'x 334, 339 (5th Cir. 2013).

predicate for demonstrating that [the supervisor] lacked qualified immunity: the law violated by [the subordinate] and the supervisory liability doctrine under which she wishes to hold [the supervisor] accountable."); *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998) ("[F]or a supervisor to be liable there must be a bifurcated "clearly established" inquiry—one branch probing the underlying violation, and the other probing the supervisor's potential liability."). Put simply, if the law did not put the psych techs on notice that their actions would be judged under the Fourth Amendment, then it cannot have put the Supervisory Appellants on notice that they had a duty to ensure their subordinates were respecting patients' Fourth Amendment rights.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of qualified immunity and RENDER summary judgment for the appellants.

19